The first case for today is number 18, 1973, United States v. Wanjiku. Good morning. It's Bhandari. Good morning, and may it please the Court. Aisha Bhandari for Enniki Curie, the American Civil Liberties Union at ALF. Any decision that this Court renders on the applicable standard for searching electronic devices at the border will apply to all of the travelers and the many millions of travelers that cross United States borders every year, the vast majority of whom are never charged with any crime. The government's position would allow it to have carte blanche to search any individual traveling the border, including business people who carry sensitive corporate or confidential business information, attorneys who carry sensitive client information and also privileged information, journalists who may carry sensitive source information. All of these individuals would have no recourse under the Fourth Amendment, according to the government's position. And that is not the lesson that the Supreme Court has provided from cases beginning with Boyd, through United States v. Ramsey, and then most recently with Riley and Carpenter. Counsel, let me interrupt you and ask a question. Part of this case, it seems to me, turns on the nature of a cell phone and digital information and how much information, as the Court explained in Riley, can be stored on a cell phone. I'm wondering, pre the digital era, what would have been permissible with respect to, say, a photo album or a diary? Would it be your position that reasonable suspicion or even probable cause would have been required for a border agent to look through a photo album? That is not our position. And I think that the Supreme Court in Riley made clear that it takes the categorical approach. So when it considered the search incident to arrest exception to the warrant requirement, it noted that there might have been the similar type of information that a cell phone carries that someone who had been arrested would previously have carried. Photo albums, journals, diaries, and so forth. But it said, nonetheless, when we look at warrant exceptions, we take a categorical approach. And we look at whether the extension of the exception to digital data can rest on its own bottom as a category. And so Justice Alito, in his concurring opinion, even noted this dichotomy that might occur where a physical copy of the same information carried by someone who had been arrested could have been searched without a warrant, but nonetheless on a device it could not be. Nonetheless, joined the majority opinion, the unanimous decision in Riley, because the balancing approach that the Riley court took showed that not only was there a quantitative difference in the amount of information that a cell phone could contain, there was also a qualitative difference. I'm going to interrupt you because my question was a little bit different. My question was, what if, let's just even say today, there was a diary or... So I'm just asking not about how it applies, whether it would transfer over. I'm just asking what would be required today, if I had a photo album or a diary in my suitcase? Currently those items are subject to warrantless search under the border exception. And our position doesn't affect that at all. And would it be your position that reasonable suspicion would be required to read my letters or read a diary or look through a photo album? So that is not our position with respect to items that individuals carry across the border with them. I do want to note that in Ramsey, however, the Supreme Court considered incoming international mail. And it did express... It both stated that you could search incoming international mail if you had reason to suspect physical contraband goods. So again, not because you wanted to read it for information or evidence. And it also noted that there was a regulation flatly prohibiting reading mail. So there is both a suggestion in Ramsey that you need a reason to search such mail, but our position does not affect... So you're basically just not taking a position on that? Yes. I don't think this case addresses that at all. So you're just not... You know, I had exactly the same question because if border agents could routinely search physical copies of photos in a driver's luggage, why would they need any additional suspicion to search electronic versions of those same copies? And I don't quite... You know, when you said quantity, I don't... I'm not getting that. I think Judge Rovner that Riley provides an answer to that. In Riley, the Supreme Court acknowledged that according to the search incident to arrest exception, if someone had been arrested, their papers, their journals, what they carried on them could be searched without a warrant. And the same is true at the border today. If you carry items in your possession to digital data, it reconsidered the balance of the privacy interests, and it noted two critical things about searching cell phones. And I want to note that the cell phone searches in Riley were manual searches, where the police could search things like call logs and texts. And it considered both the quantitative difference, the fact that no individual previous to the digital era could have carried the sheer quantity of materials on their person, either across... Just traveling, but that same holds true at the border. And two, the qualitative difference. And in particular, it noted internet browsing history, and provided the example of people who might be searching for symptoms of a disease and visiting WebMD, or searching history that might reveal religious or political inclinations. And in particular, historical location information was another category of information that just did not have a non-digital analog. So what about digital information, or a digital device that doesn't include anything besides photographs? So what about a digital camera where all you have are the recorded images, but you don't have WebMD and contacts and texts and browsing history? I think, Judge Barrett, that the Supreme Court took a categorical approach with digital data. But nonetheless, if there is a category of such a device, if we're talking about a pure... Just photographs, for example, I don't think that that issue is before us. I understand, but you understand... You're not answering any of those questions. I mean, I think if you can't read letters, that helps your position, right? If you could say that you're not taking a position, even on whether you need reasonable suspicion, say, to read letters. That would help you if you thought that you did. Well, I'm saying that under the current case law, and I don't think that the question of whether digital devices require individualized suspicion goes to the question of letters. I understand the question... I understand why you don't want to take a position. I'm just saying I think it would have helped you to take a position. And I don't read Riley quite so categorically as you do. I think Riley relies heavily... First of all, it's in a different context, a search incident to arrest. But secondly, Riley relies really heavily on the vast variety of information that's within a cell phone. And in my hypothetical of a digital camera, you're talking about one kind. I think that's correct, Your Honor. But nonetheless, I do think that Riley, for example, it mentioned the categories of information that could exist, and it didn't hinge its decision on what exactly was searched. So for example, it made clear that it doesn't matter if police say, we will In the particular searches that were at issue in Riley, in fact, there wasn't a very extensive search. I think officers have only looked at call logs and text messages, maybe photos. It was the potential for the vaster search. And I think certainly digital photographs, which at this point with technological advances, there's often metadata attached to them. I'm not sure there's a justification for treating them categorically differently. But nonetheless, this is a case involving cell phone searches. And I think for that reason, Riley, it teaches us exactly how to do the balancing. And I don't think that the search incident to arrest exception is so different from the border search exception. In one instance in Ramsey, the Supreme Court directly acquitted them, and it said that they were both historic exceptions of longstanding. And similarly, I think the Riley court decision has been applied in other contexts where warrants have generally not been required, including probationary searches and in vehicle search contexts. So other courts have been applying those lessons to other warrant exceptions. Ms. Banduri, it's not your fault because you don't know. But for some reason, you're not getting your yellow light, which you should have gotten. So you are eating into Mr. Herman's time. We have a very, very long day today. Yes, thank you very much. You're going to have to let... You better give Mr. Herman a few more minutes. May it please the Court, Josh Herman. I'm actually counsel of record for appellant and defendant Donald Wanjiku. Does the record tell us if the photos and footage were created in the Philippines? That's not in the record, Your Honor. Would it matter to your argument? I do not think so, Your Honor, if it would or it would not. The key issue, and we chose this order even though it's a little disjointed because obviously the Fourth Amendment issue, I think, is the key threshold issue. And it is the issue that is applicable to every international traveler that comes through O'Hare and every device that they have. Are you saying that we don't know if the materials at issue here were electronically transmitted to the phone rather than, say, photos taken by the phone in the Philippines and immediately stored on the phone? In the course of discovery, Your Honor, there were... I think there were matters that could be said that were put in dispute, but these were never litigated because this was in terms of the forensic aspects of the digital data that was on the phone, the hard drive, or the laptop because this was a motion to suppress and then a conditional plea that followed. So even during the sentencing proceedings, we didn't get into the forensic analysis or analyses that were performed, including file pass, metadata, exit data of those photos. You know, we know that courts generally have required nothing more than reasonable suspicion for a body cavity search at the border. In what sense is a forensic search of the phone more intrusive into privacy interests than a body cavity search? Well, I think that the dichotomy between the body cavity search and the pat-down derives from the routine versus non-routine distinction that's developed in the cases and... Well, the courts kind of repeated that as a doctrinal test. That's right, and I think that once we start making the comparisons between physical and... The comparison to make between a digital device and then a physical cavity search or a physical search, they each implicate different privacy concerns. One is a physical intrusion. Another is an intrusion of a different nature where you could go your entire history, your private lives, and what happened here simply during the manual search, not during the forensic search, is the first image that the border agent pulled up in the phone after compelling my client to provide the password under threat of detaining his phone and taking it to a lab was a photo of him, my client, in bed with another man. I mean, this is the image that's not in a photo album, and I think to Judge Bair's questions and Judge Rovner's questions about what's the difference, we typically don't carry those types of images in photo albums that we would cross in the border of such intimate moments. I mean, they would be in a phone. That's just the nature of the digital era where their password protected on that device, and that photo in the bedroom was the core type of concern that animates the foundation, the Supreme Court's foundational Supreme Court policy. Can I follow up on Judge Rovner's question, though, and ask you? Sure. I think what Judge Rovner and I are interested in a similar question, which is it seems to me that if the Supreme Court required only reasonable suspicion for a very intrusive search of body cavity, which is different than a pat-down, this elementary canal thing, I think we're asking why is this so much more intrusive than a very intrusive physical search that probable cause and warrant would be required? I think that there are different interests, again, and that's the best way that I can answer that. And the different interests stem from the Riley body of case law that's now I'm not sure that I can answer this in any other way by doing a comparison of which is more intrusive than the other, because they're both equally or they're intrusive in different and significant ways, and they implicate different constitutional concerns in terms of privacy and in terms of perhaps a physical violation that needs to be supported by reasonable suspicion. But why? In other words, why should the medium in which the photos are carried matter for the level of privacy protection? It deals also, it dovetails also, and this goes to, I think, the question that overarches Fourth Amendment cases is the reasonableness, and we also consider the reasonable expectation of privacy. And I think that there, and this is also, again, coming from Riley in cases that focus on digital devices, there is a different type of reasonable expectation of privacy that is inherent in digital devices. They're just treated categorically differently. More than in one's body? Again, I'm not trying to make But it has to be higher, but you're resisting making a threshold argument, but it has to be higher. You have to be making an argument that one has a greater expectation of privacy in digital data than one does in the integrity of one's body. Otherwise, if you have a similar level of expectation of privacy, it's treated the same way. Well, I'm not prepared to rank what is greater than another body or a cell phone. I just think that they're different, and they're being treated differently. I also think that in addition to your question about Ramsey and the letter, again, that's not before us right now, but I think it brings up an important point, and also with Boyd, where I think that when we're considering the key question about whether or not the exercise in the application of the border search doctrine to conduct warrantless searches on digital devices is untethered from the purpose of that very exception, we need to pay close attention to the limitations that are placed in this doctrine. I think we need to look closely at its origins in the Customs Act, and the clear language in Boyd in terms of saying that there is a fundamental difference between heaven and earth, between a search for customs, a search of goods for unpaid customs and duties, and then a search for criminal evidence of one's personal papers and effects. This, again, we have to remind ourselves, was a criminal investigation. Dealing with the specific facts of the case, where I was going to focus on the reasonable suspicion issues, this is a criminal investigation that began with pre-targeting before Mr. Wanjiku even landed. I want to go back for a second, because of something you said. It appears that the border agents focused only on photos and videos. They did not search email location data, or any of that other personal data that is now being cited as a concern. If the manual and forensic searches were confined solely to the photos and videos, to the purpose of Operation Culprit, should we use a different expectation of privacy? Should we use a different expectation than if the entire contents of the phone had been searched? I think that's a very difficult line to draw, Your Honor, for several reasons. That's why I'm asking you. One is that each of these devices was searched with a forensic software program, Cellbrite XRY, another one called NCASE. These were the same programs that were used to conduct what the government is calling a full forensic search. There are just various settings that I gather could be placed to limit the searches. The search is as intrusive, but for lack of a better description, a switch that could be flipped. To your question, Your Honor, about is there, I guess, a qualitative difference between the different types of information that's searched, photos can contain their files. They're JPEG files, so you could have an email saved as a JPEG file. You could have a doctor's note saved as a JPEG file. You could have a map that describes your associational activity saved as a file. Limiting it to finding solace in any type of limitation on the searches just being for photos and videos doesn't diminish what we consider are the substantial privacy invasions here. Plus, again, the photos and videos that were searched here were extremely revealing to an individual's intimate and personal moments. I hope that answers your question in that regard regarding the limitations that could possibly be placed. There is no line that we can draw, and I think this goes back to why we think that the distinction between routine and non-routine searches is not one that can be maintained in the digital era. We saw that in Kylo, where courts and individuals would be at the mercy of advancing technology. We're talking about searches now that happened in 2015, and I can only imagine that the technology has advanced to such a degree right now where we're already behind the ball. I believe I'm in my rebuttal time right now, and I'd like to reserve the rest unless there's a follow-up question. Thank you. And would you be kind enough to add two minutes to Mr. Parent's time, because of the two minutes we've... May it please the Court, my name is Chris Parenti, and I represent the United States. Your Honors, I want to turn right to the questions that you asked before about the photo albums and the digital camera, because I think that's exactly the government's point here. The government's position is the case law is clear, that searches such as that require no suspicion whatsoever, meaning if I were a traveler, and I were traveling pre-digital age, and I had my photo album in my luggage, there's no question in the government's opinion that there was no suspicion required to search through that photo album. Then why did the government seek a warrant for the second search of the cell phone and other electronic devices? Why was the border rationale not sufficient to justify the more searching investigation? Because that seems inconsistent with the position that you're taking in our court now. Absolutely, Judge, and I think... Absolutely what? The government was out of an abundance of caution. I think the argument could be made that that second forensic search could have been done under the border search doctrine. However, at that point, out of prudence, the government sought and obtained a warrant. But going back to this issue of the photo album or the digital camera, the case law is clear, the Supreme Court is clear, that routine searches of the person and effects of entrance are not subject to any requirements of reasonable suspicion, photo albums being the effects. But what about... I mean, Riley, so they had a statute that required reasonable suspicion, so they didn't have to answer the question, but the court seemed sympathetic, at least indicted, to the idea that before you read letters... In Ramsey. Sorry, yeah, Ramsey. Before you read letters, reasonable suspicion might be required. So what about that? What if you had a diary or letters? Would the government be able to just... Without any suspicion. Yes, the government's position here is without any suspicion whatsoever. That's very breathtaking, you know. But it is and it isn't, Your Honor, right? Because at the end of the day, the government... This is the border. It's a separate context, and it's a very unique place where we recognize the government's interest is at its highest point. And so these are things that a traveler is choosing to bring with them. All international mail, even if not in the person of a traveler? Yes, because it's coming into the country. Oh, my God. Well, and if you look at the Ramsey case, the heroine was inside of the mail. So is the government to say, as long as the heroine's coming in, international mail? They didn't read the content of the letter. They felt and they could feel a package, and then the court said it was okay for them to look to see the bulk, but it was a pains to say that the statute prohibited the reading of the letter. Agreed, Your Honor, but let's look at this case, and let's assume Mr. Wanjiku had mailed the child porn back. They would have to open up the letter and then look at the contents of the letter. Can you explain how Operation Culprit is related to concerns regarding border crossings? In other words, what about that physical crossing of the border justifies this criminal investigation? I ask because it seems to me that all of this could have been sent electronically and has nothing to do with a physical border crossing. And I would disagree, Judge, and this case is a perfect example, right? The sex tourism statute prohibits Americans from traveling overseas to engage in illicit sexual conduct with minors in countries such as the Philippines, and that includes, while they're over there, taking photos of those individuals and bringing them back here as part of their child porn collection, which this defendant, in fact, he did bring back that stuff when he returned. Although you're not sure where those pictures were taken. You don't know if they were taken in the Philippines. He might have taken them in the States or gotten them from someone else. Absolutely. He could have, and all we know about those photos that's in the record right now is that those photos weren't recognized by the National Center of Missing and Exploited Children, meaning it wasn't a known image, which arguably is the inference, at least in favor of maybe the defendant took it, and they were young Asian boys sitting on a bed focused on the penis of the young child. So yes, could he have taken it? Certainly. We know it's not a known image, meaning that we can't exclude him, so he's still included. But the point of this operation is for what we saw here. Travelers who travel overseas to engage in illicit conduct with children who then come back, and it criminalizes the production of child pornography. Is there a way to discern whether data which is transmitted electronically has crossed a border? You know, he seems to have been charged with transportation of child pornography. I'm trying to get the transportation part. Absolutely, Your Honor. He had on all three devices that he carried with him from the Philippines into our country across our international border contraband, child pornography. On each device that he carried, he had videos and images of something that this country bans and prohibits, rightfully so. So is it the government's position that these photos and videos had crossed a border one way or another, either coming out of the United States or coming into the United States? Is that your position? Yes, but I don't think that's necessary for the crime that he pled guilty to. He pled guilty to transportation of child pornography. Arguably, transportation from outside the country, but it was on his person. It was on the devices, all three devices that he carried with him. Why aren't you arguing that he consented to the search when he gave the passcode? To the phone? Well, that would be one of the devices, and you could argue that. The first device that was searched was the external hard drive, and then the phone, and then the computer, but in no way, we never asked him if we could search the device. We just said by the passcode. Could the government have searched the cloud account? No. I'm not done. You know your case so well. The cloud account that was associated with that phone without a warrant and without reasonable suspicion, and why or why not? The government's position would be no, and again, it goes back to the point of the border search. It's things that you're bringing with you into this country, and the government has to decide, hey, can this person come in? Can this property come in? Is it okay to enter our international border? Stuff on the cloud is not being presented at the border. Riley pointed out that it's very difficult to tell whether you're, when you open a phone and you're looking at data, if you're pulling it from the cloud or not. So isn't it an administrable line to say you can search what's physically on the phone so long as you're not pulling anything from the cloud? Yes, and there's different ways to do that, right? You could, one, put the phone in airplane mode, which would then disconnect it from any internet devices and therefore keep anything in the cloud out, and two, and most importantly, the traveler has complete control over what they present at the border, right? So the traveler, who knows that my phone might be subject to search just like anybody else's who comes into this country, can turn their phone off, can put it in an airplane mode before they go to customs, can delete items from the phone if they wanted, or simply could not bring a phone if they so chose. So if the phone was turned off, it wouldn't be subject to search? No, I'm saying they could put it in airplane mode, turn it off, to prevent the cloud matter from being searched. This is just in relation to the cloud. Well, but under your theory, I take it the agent can turn the phone on. Correct. Well, so what's that about? All I'm saying, Judge, is if you're the passenger and you're worried about your cloud data, agents have been instructed under current CBP policy to put the phone in airplane mode. If you were worried about that policy being followed in any particular way, you as the passenger can choose to put it in airplane mode, turn the phone off, so that when the agent powers the phone up during the search, it's not connected to the internet, therefore there's no danger of the cloud being searched. Well, they'd flip it back out of airplane mode. Correct. Right. You could search the cloud. I'm saying that our position is that information that's not stored on the device is not being presented by the traveler at the border, and therefore that's not subject to the border search document. This does not make sense to me. Let me try to- You better really try and explain. Anyone out there understand? Sure, Your Honor. Stuff on the cloud, you could only, your phone can access data on the cloud only through an internet connection. If you turn your phone off, if you disable the ability to access the internet, then the only thing you're presenting at the international border is stuff actually stored on the phone, which is what we always argue is what is exactly subject to the border search, because you're presenting yourself and your effects, which the Supreme Court has said requires no suspicion to search at the border. The stuff on the internet, on the cloud, isn't being presented at the border, therefore it can't be searched. But the agent can switch that phone off of airplane mode, and then the cloud becomes relevant again. Right. Absolutely, but the agent can do a full body search as well, but there's different standards for those things. What we're talking about here is, you asked the government's position on cloud data, the government's position is that it's not subject to the border search document. So you're saying that, I think, is your response that if the agent did that, flipped out of airplane mode, and put stuff on the cloud, then it could be suppressed, because it would go beyond the exception? Then you would have a different analysis, because it's not under the border search doctrine, you would have to look at other exceptions. What exceptions? Again, depending on the scenario, I'm saying it would not, the government would not argue that that is a border search rationale to search cloud data. Is there any situation at the border in which probable cause, and possibly a warrant, would be required, or is reasonable suspicion the ceiling? The government's position at this court said in Johnson that reasonable suspicion is the ceiling, and a Supreme Court, nor any court ever, has ever held probable cause or a warrant is required at the border. So this, what defense counsel is asking Your Honor to do would be for it to be the first court in the country to ever require probable cause or a warrant for a property search at the border, or any search at the border. You know, there's certain countries known as destinations for persons who are hiding assets from the IRS. Can the government set up sting operations for persons returning from the Cayman Islands, for example, and search the contents of a person's cell phone, including email and financial documents? Is that distinguishable in some way, or? The government's position is, regardless of the motive of the search at the border, anyone who's coming in to this country at the international border, the government has the right to inspect anything that you present, that you choose to present, to come into this country. If you come back from the Cayman Islands with a briefcase of financial documents, that's just as much subject to inspection under the border search doctrine as the photos in your photo album from your trip, the clothes in your suitcase. You just said that you, you know, offer. Are you, didn't, they didn't ask for his phone? He chose to bring his phone with him. Okay. And on that phone, he decided to put contraband, stuff that we don't want in this country. He decided, I'm going to take this stuff that the United States doesn't want and present it for inspection at our border. We said, we're going to look at it because we don't want things that we don't want here. But in other words, he couldn't have chosen not to hand his cell phone over. Correct. Okay. He just could have chosen not to bring it across the border. Right. He could have chosen not to bring it. Okay. I misunderstood. Either I misunderstood you or you made a mistake. I misspoke, Your Honor. But I think that's the purpose because here when you're looking at this balancing test, the government has no choice in who or what comes to its border. We have to accept and make decisions on who comes to this border, criminals or non-criminals and what they bring. Travelers have a choice about what level of privacy they're willing to have invaded because they can decide at the end of the day how inconvenient it might be to not bring the phone with them. Is that a distinction between the border search and the Riley situation? I would argue it is, Your Honor. I would argue it is because passengers, and the court has recognized this, that at the border it's understood that people have a lesser expectation of privacy because you know you're going to have your items searched. You know, back to Riley for a minute. You know, the brief asserts that it need not have brought, sorry, the good faith exception argument earlier because there's been an intervening change in law. I mean, what's that intervening change in law? Riley was decided in 2014 before the agents searched the defendant's phone. Are you relying on something newer than Riley? If so, you know, what is it and on what binding precedent did the agents rely when they searched the phone? And that's the interesting part about the good faith argument here, Judge, is there is no intervening law change. That's why we really didn't make the good faith argument below. If this court decides for the first time as the only court ever to decide that probable cause or a warrant is needed, now that's going to be the intervening change in the law. Therefore, if this case were sent back, we would make the good faith argument. But the government's point is Riley didn't change the border search exception. So we couldn't have really made a good faith argument except as we're doing now, sort of a change in the law. The change in the law is what defense counsel is asking this court to do for the first time ever. And that's why there was no good faith argument made below. We're making it now, again, in almost like an anticipatory argument in case that is where this court would ever decide to go. Now you would agree, I take it, that the Supreme Court hasn't addressed this issue in this precise setting. Correct, Your Honor. You would, yeah. Huh. Oh, lucky us. Well, that brings up a question of why, in this particular case, on these facts, we need to draw these difficult lines in the first instance because there was plenty of reasonable suspicion here. And no court has held that more than that is required. And I would agree. The court does not need to take on the constitutional issue if it chooses not to because of what Your Honor just said, that there was more than enough reasonable suspicion here, which is the highest standard that's been required by this court or any court at the border. And there are reasons to hold off on attempting to draw those lines because of the fraught nature of the Fourth Amendment question in the digital age. So if we don't have to decide, why reach out and decide? Absolutely. This court can do exactly what the district court did, which was to decide this on grounds that don't implicate the Fourth Amendment issue. Because what you say is, we all agree there's reasonable suspicion here. That's the highest standard that's ever been required. We don't need to discuss, we don't need to address this issue right now. And ordinarily, we don't write new constitutional rules when we don't have to. Correct. Which is what the defense counsel has asked me to do, is create this new standard of probable cause and a warrant, which has never been required by any court, the Supreme Court, this court, or any court in this country at the border. Well, even requiring reasonable individualized suspicion is an extension of that rule to the border search context, where it never has gone before. Right. I'm sorry. So what I would be asking is that this court say, no suspicion is required for a search of electronic devices. Right. My point is that we've got two extremes. The defense is asking for a probable cause and warrant requirement. You're asking for a no suspicion requirement. Correct. The only other courts of appeals that have addressed this issue and squarely held that some level of reasonable individualized suspicion is required, has set that as the ceiling. Not probable cause, not a warrant, just reasonable suspicion. So even if we were to just assume for the sake of argument that that is required, we've got that here. We don't have to decide even that question in order to resolve this particular case. That's correct, Your Honor. Because the suspicion level here was not just the criteria for the Operation Culprit program, which applied to all travelers, but there was specific suspicion that this particular traveler was a sex tourist. Correct. Based on how he behaved, based on his criminal record, based on his travel history, et cetera. Absolutely. All the factors cited in our brief that the experienced agent who met him at the border observed. It was a combination, of course, of behaviors. It was, Judge. And there was... But if you chose one that the agents are looking for, what would it be? If I chose, of all the factors... Yeah. One particular behavior, so that the people in this courtroom won't do that. Judge, I think the defendant, again, the agent who has five years of experience and has examined thousands of passengers coming in, I think when he said that the defendant appeared visibly nervous, was sweating profusely, was shifting his body weight, I think that's a red flag. I think when he found out that the defendant's answers were inconsistent about, hey, I stayed with friends over there for the 60 days, and he looks in the suitcase and finds all these one-night stays at hotels in the Philippines, I think that's a very big red flag here. Explain to me why going to a bathroom that's farther away is one of the signs. It's, again, in this context, and the district court made a very good observation, it's not any one of these things can happen. No, no, I know. But why would that be one indicia? I think what the agent testified to at the hearing, Your Honor, was in his five years, again, working at this place, he's never seen someone leave the line and go to a different baggage hall to use a different bathroom. I could come up with all kinds of reasons why that might have happened. Again, we would never arrest him. See, I can't get that. He was told to stay? He was told to stay. He's in line. He's waiting to be examined, then he leaves. I could say that maybe he was dumping evidence, flash drives or SIM cards, down the toilet. There's all sorts of reasons he might have done that. In other words, a far... Yes. He's not going to be near... Outside the sight of the people that could see him who were going to examine him in mere minutes, yes. It's just a possibility. And again, we would never arrest just on that. Oh, no, of course not. That was just one of the factors that the agent noticed. And he thought it was odd because he's never seen it happen before. And so... Yeah. But if there's no other questions, we would ask that you affirm judgment and sentence in this case. Thank you very much. Thank you. Thank you very much. Okay. I'd like to pick up on one thread that the court was asking the government about the nature of digital data here, which I think really distinguishes what's before the court now, even from letters. And what I would direct the court to is Judge Jill Pryor's dissent in the Vergara decision from the 11th Circuit, when she writes, unlike physical contraband, electronic contraband is borderless. It can be accessed and viewed in the United States without ever having crossed a physical border, which gets to the question that I was trying to ask about how is this exception being tethered to the underlying purpose of the border exception doctrine? And again, I think Ramsey and Boyd in particular answer that this is a gross expansion of the government's authority to search each and every device that comes in. And the government's position would actually, it's just as easy for individuals to, or maybe not easy, but individuals can wipe their devices, send it all to the cloud, turn their phones off, or even use burner phones, and cross the border. This is not an exception that is tailored to collect that particular type of evidence. And I would direct you to Judge Wilkinson's concurrence in the Kohl's case about caution and restraint in reaching out to decide unnecessary constitutional questions when there's a narrower ground on which to rest the court's decision, especially in an area that's so fraught with national security and border sovereignty concerns, as well as important privacy interests. Why would we venture into the Fourth Amendment thicket when we don't have to? I understand the issue of constitutional avoidance, and I appreciate the court bringing it up, but this is a matter that is ongoing right now. It's happening at O'Hare right now. The ACLU points out statistics in their brief about how rampant this is. And it's not just individuals who are being suspected of criminal wrongdoing. It's completely innocent travelers. And again, to bring this back to Riley, Riley was an arrestee. We're talking about people, even Mr. Wanjiku, who may have been suspected but haven't committed any offenses right now. Very briefly with the reasonable suspicion, I would just, again, the matter cited by the court, were things that happened after Mr. Wanjiku was already targeted for searching. And as the agent said, we were going to search everything anyway. That doesn't matter, though. The subjective intent in advance doesn't matter. It's judged at the time of the search. See, my time's up. And I didn't want to end on that point, but you may not only can, you must answer the question. I think this is different than the classic Wren example, where there wasn't anything that was particularly, an objective failing to use a signal that gave rise to a criminal offense, however minor, that would give the officer's cause to pull somebody over, regardless if they decided to. What we're focusing on are the looking at his social media, determining that he's a And as he has a masquerade ball mask on his Facebook page. And as the agent said, what he said younger, and then the transcript shows, I can say they weren't 30. And we all know that you can choose any avatar on your Facebook page. And it's a chilling prospect to think that these types of searches and targeting is going on. And we set that forth in our brief. But I believe that, to your question again, this is, and I understand the concern, this is an ongoing and prevalent matter. And there may never be a case where there's not some type of suspicion giving the threshold standard of somebody being sweaty or shifting their weight after a 16 hour flight, or using the wrong bathroom to give cause to search their digital devices. This is a question that I think begs to be asked, or answered. It does, but there are much closer cases than this one that would arguably, at least, put the question in sharper relief. Well I think- Here the degree of suspicion, articulable suspicion, and the facts in support of it are abundant. Well, I would respectfully disagree for the reasons set forth in our brief. But in terms of the question being put in sharper relief, the question about whether or not the Fourth Amendment is, requires a warrant at this stage, is in the sharpest relief. And with that, I'll request, respectfully request, that the Court reverse the District Court's denial of Mr. Mongeek's motion to suppress. Thank you. We will thank you, and we will thank you Mr. Prendy, and we will take the case under advisement.